**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**FILED**
February 18, 2019

No. 16-11482

Lyle W. Cayce
Clerk

————

EUNICE J. WINZER, Individually and on behalf of the statutory beneficiaries of Gabriel A. Winzer; SOHELIA WINZER; HENRY WINZER,

Plaintiffs - Appellants

v.

KAUFMAN COUNTY; BILL CUELLAR; GARRY HUDDLESTON; MATTHEW HINDS,

Defendants - Appellees

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

HENRY ANDREE WINZER, also known as Henry A. Winzer,

Plaintiff - Appellant

v.

MATTHEW HINDS, Individually and in his capacity as member of Kaufman County Sheriff Department; UNKNOWN STATE TROOPERS, Individually and in their capacity as member of Texas Department of Public Safety; UNKNOWN PARAMEDICS, Individually and in their capacity as emergency responders of the East Texas EMS; SERGEANT FORREST FRIESEN,

Defendants - Appellees

————

Appeals from the United States District Court for the
Northern District of Texas

————

No. 16-11482

Before DENNIS, CLEMENT, and GRAVES, Circuit Judges.

PER CURIAM:

This case is a § 1983 action arising from the deadly shooting of a young man by Kaufman County law enforcement officers responding to a 911 call. The district court dismissed all claims against the individual officers and the county. We now AFFIRM in part and REVERSE in part.

## BACKGROUND

### I.    The use of force.

On April 27, 2013, 911 dispatchers received multiple calls of a man standing in a rural street shooting a pistol. The man reportedly was kicking at mailboxes and pointed a gun at a house. The man further appeared agitated, speaking to himself and yelling "everyone's going to get theirs" and "I'm just trying to get back what's mine." Callers described the suspect as a black male wearing a brown shirt and jeans.

At approximately 10:30 am, dispatch relayed these details to law enforcement units in the area. Pertinent here, dispatch specifically informed the officers that the suspect was a "black male wearing blue jeans and a brown shirt." Officers Matthew Hinds, Gerardo Hinojosa, Gary Huddleston, William Cuellar, Brad Brewer, and Keith Wheeler responded immediately to the area.

Hinds and Hinojosa arrived at the scene first and observed a suspect matching dispatch's description in the road 150 yards away. Both officers angled their vehicles to provide cover and took up defensive positions. The suspect then raised his hand and fired directly at Hinds and Hinojosa.[1]

---

[1] It is not clear if Appellants dispute whether this shot was in fact fired. For purposes of this appeal, we assume that a suspect did fire a shot at Hinds and Hinojosa. Appellees have presented contemporaneous video and radio records from police dashboard cameras indicating "shots fired." We cannot and do not assume, however, that Gabriel Winzer was the suspect who fired the shot.

2

No. 16-11482

Neither officer returned fire because there were multiple civilians in the area. Hinds "relayed to dispatch that shots had been fired by the suspect." The officers did not report that the suspect was in possession of a bicycle. The suspect then disappeared into the trees and the officers lost visual contact. Appellants' summary judgment evidence indicates that at the time of this shooting, Gabriel Winzer, the decedent, was inside his father's house and did not fire this shot at the officers.

Shortly thereafter, Huddleston, Cuellar, and Wheeler arrived. Hinds informed Cuellar and Wheeler that a suspect had fired shots at him and Hinojosa. Hinds told at least Cuellar that the suspect was "wearing a brown shirt."

The suspect then re-appeared at a distance between 100 to 500 yards from the officers. Because there were civilians in the area between the officers and the suspect, the officers decided to "move down [the road] to keep the public safe and attempt to move them inside their homes." At this point, the officers again confirmed several times that the suspect was wearing a brown shirt. The officers advanced down the road in a defensive position secured by three vehicles. As they advanced, the officers directed civilians into their homes. During the approach, the officers lost sight of the suspect. Accordingly, upon reaching the suspect's last known location, the officers set up a defensive position "for better cover." Hinds "angled [his] vehicle near the southwest corner [of the street], Trooper Hinojosa angled his vehicle near the northwest corner, and Deputy Wheeler positioned his marked Chevy Tahoe behind and centered between those vehicles."

Huddleston was on the Tahoe's driver's side. Cuellar was kneeling down on the driver's side by the front tire. Wheeler was away from the Tahoe in a ditch. Hinds and Hinojosa were near the passenger rear of the Tahoe. Four of the law enforcement officers had semi-automatic rifles and one had a shotgun.

3

No. 16-11482

The officers began giving verbal commands for the suspect to drop his weapon and "come out."

"After a few minutes," the officers spotted a figure on a bicycle enter the road. The rider was wearing a blue jacket instead of the brown shirt the suspect had been wearing, and was over 100 yards away. What happened next is highly disputed[2] and central to the resolution of this appeal. All of the officers claim the rider was armed, raised a pistol to a firing position, and they feared for their lives.

As it turned out, the person on the bicycle was Gabriel Winzer, and not the suspect who had fired at Hinds and Hinojosa. According to Appellants, Gabriel was on an innocent mission to show the officers his toy pistol. Gabriel's father claims that when Gabriel rode off toward the officers "[he] did not have anything in his hands," "had both hands on the handle bar of his bike," and "did not reach for anything nor did he have anything in his hands when he was shot." Moreover, Mr. Winzer claims that Gabriel was "unarmed," "did not fire any shots," and "did not point anything towards the deputies." Indeed, Mr. Winzer states that "Gabriel did not move his hands in any way that might have suggested that he was reaching for something."

While Gabriel's actions on the bike are disputed, it is beyond dispute that an officer yelled "put that down!" The officers then fired within six seconds of spotting Gabriel on his bike. Three officers fired Bushmaster AR-15s, one officer fired an M4 patrol rifle, and the fifth fired a Remington 870 shotgun. In total, seventeen shots were fired. Four bullets struck Gabriel, who was still over 100 yards from the officers. Upon being hit, Gabriel fell off his bike and

---

[2] "Because this case comes to us on appeal from a summary judgment, we are obliged to review the record and construe the facts in the light most favorable to [Appellants], the nonmoving part[ies] in the court below." *See Sanders v. English*, 950 F.2d 1152, 1154 (5th Cir. 1992); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

fled out of view. The officers remained in their positions before fanning out to set up a perimeter around Gabriel's house.

Meanwhile, Henry Winzer, Gabriel's father, was attempting to provide assistance to Gabriel in their back yard. After some time, the officers surrounded the yard and advanced on Gabriel and Henry. Henry told Hinojosa that Gabriel had been shot. As they approached, the officers asked Henry where the gun was. Henry informed the officers that the only gun they had was a toy cap gun. Henry then tossed a toy gun towards the officers and said "there is your gun." Nonetheless, the officers approached with caution because the "suspect had his arms underneath his body and no one knew whether he still had a weapon."

When the officers attempted to cuff Henry and Gabriel, both resisted. Huddleston and Brewer both tased Gabriel during this encounter. "About 10 seconds after the last Taser deployment, [Gabriel] went limp and [the officers] were able to handcuff" him. EMS later pronounced Gabriel dead at the scene.

## II.    The Procedural History

On April 22, 2015, Henry filed cause number 15-cv-01295, in the Northern District of Texas. In a *pro se* complaint, Henry asserted claims against Hinds, "unknown state troopers," and "unknown paramedics." Compl. at 1, *Winzer v. Hinds et al.*, No. 15-cv-01295 (N.D. Tex. 2015), ECF No. 1 ("Henry Complaint").

Separately, on April 27, 2015, Eunice Winzer, Gabriel's mother, filed cause number 15-cv-01284, in the Northern District of Texas against "Kaufman County," "City of Kaufman," and "City of Terrell."[3] None of the officers involved in the incident were named defendants. *See* Eunice

---

[3] Appellants later voluntarily dismissed the City of Terrell and the City of Kaufman.

No. 16-11482

subsequently filed an amended complaint and a second amended complaint, again failing to list any of the officers as named defendants.

On September 18, 2015, Eunice filed a third amended complaint in 15-cv-01284 individually and "on behalf of" Henry.[4] The Third Amended Complaint alleged violations of Gabriel's Fourth Amendment right against excessive force and failure to train against several defendants. Relevant here, Appellants listed Cuellar and Huddleston as named defendants for the first time. Appellants additionally formally added Hinds as a named defendant in cause number 15-cv-01284. This essentially consolidated the parties from the two pending lawsuits and, on September 21, 2015, the Court formally consolidated the cases.

On January 15, 2016, Hinds, Cuellar, and Huddleston filed a motion for summary judgment. Cuellar and Huddleston argued that the claims against them were time-barred. All three of these officers also asserted that they were entitled to qualified immunity.

While the motion for summary judgment was pending, Appellants sought leave to file a fourth amended complaint to add Hinojosa and Wheeler as defendants. The district court denied the motion for leave to amend. The court ultimately granted summary judgment on both the limitations and qualified immunity defenses. Kaufman County then promptly sought summary judgment, arguing that there could be no county liability if there was no constitutional violation by its officers. The court granted Kaufman County summary judgment. The district court denied a motion for reconsideration, and this appeal followed.

---

[4] Appellants had retained counsel and were no longer *pro se* as of May 12, 2015.

No. 16-11482

## DISCUSSION

Appellants argue that the district court erred in four ways. First, that the district court erred in granting summary judgment to Cuellar and Huddleston based on limitations. Second, that the district court erred in denying leave to add Hinojosa and Wheeler as defendants. Third, that the court erred in granting summary judgment to Hinds based on qualified immunity. Fourth, that the court erred in granting summary judgment to Kaufman County. We address each in turn.

## I.     Claims Against Cuellar and Huddleston Are Time-Barred

The district court ruled that Appellants' claims against Cuellar and Huddleston were barred by a two-year statute of limitations. Appellants argue that the court should have related the claims back to the date of the original complaints. The district court did not err.

The limitations period for a § 1983 action is determined by the state's personal injury limitations period. *Whitt v. Stephens Cnty.*, 529 F.3d 278, 282 (5th Cir. 2008). In Texas, that period is two years. *Id.* When a plaintiff adds a defendant after the limitations period has run, Rule 15(c) allows the plaintiff to relate the claims filed against the new defendant back to the date of the original filing. *See* Fed. R. Civ. P. 15(c). To do so, the plaintiff must show both that the added defendant received adequate notice of the original lawsuit and that the defendant knew that, but for a mistake concerning the identity of the defendant, the action would have originally been brought against the defendant. *Jacobsen v. Osborne*, 133 F.3d 315, 319-22 (5th Cir. 1998). Rule 15(c) is meant to "correct a *mistake* concerning the identity of the party." *Id.* at 321. "'Rule 15(c) does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities.'" *Id.* (quoting *Barrow v.*

7

No. 16-11482

*Wethersfield Police Dep't*, 66 F.3d 466, 470 (2d Cir. 1995)). We review a grant of summary judgment *de novo*. *Whitt*, 529 F.3d at 282.

The incident at issue occurred on April 27, 2013. Accordingly, Appellants had to file suit by April 27, 2015. *See Whitt*, 529 F.3d at 282. Appellants did not add Cuellar or Huddleston as named defendants until their Third Amended Complaint on September 21, 2015. Appellants added Cuellar and Huddleston, therefore, after the two-year limitations period had expired.

Nonetheless, Appellants argue that their claims against Cuellar and Huddleston should "relate back" to the filing of the original complaint under Rule 15(c). Appellants assert two primary grounds for that argument: (1) the original complaint listed "unknown officers" that clearly gave the defendants notice; and (2) Appellants diligently tried to identify the officers and added them as soon as they did. Neither argument has merit.

First, this court has clearly held that "an amendment to substitute a named party for a John Doe does not relate back under Rule 15(c)." *Whitt*, 529 F.3d at 282-83. Thus, to the extent Appellants sued "unknown officers," they cannot use these "John Doe" claims to now substitute in Cuellar and Huddleston after the limitations period. *Id.*

Second, even if Appellants were diligent in trying to identify Cuellar and Huddleston, such failures to identify do not relate back. Rule 15(c) requires a "*mistake* concerning the identity of a party."[5] *See Jacobsen*, 133 F.3d at 321.

---

[5] Appellants further cite to *Jacobsen v. Osborne*, 133 F.3d 315 (5th Cir. 1998), for the proposition that an "identity of interest" "exception" to Rule 15(c) saves their claims. However, this doctrine only applies to Rule 15(c)'s requirement that the substituted party must have received notice of the suit. *Jacobsen*, 133 F.3d at 320. It does not relate to 15(c)'s second requirement that there also be a mistake of identity. *See id.* at 319. It is on the second requirement that Appellants' argument fails and the "identity of interest" exception does not cure that fault. *See id.* at 320-21 (applying "identity of interest" exception to imply notice where plaintiff mistakenly named individual officer, but not applying "identify of interest" exception to claims against unnamed John Doe deputies).

"[F]ailing to identify individual defendants cannot be characterized as a mistake." *Id.*

The district court did not err in granting summary judgment to Cuellar and Huddleston based on the statute of limitations.

## II.    Claims Against Hinojosa and Wheeler Were Futile

The district court denied leave to amend to add Hinojosa and Wheeler on the grounds that the claims would be futile as barred by the statute of limitations. Appellants again assert that the claims against Wheeler and Huddleston should relate back under Rule 15(c). Appellants' argument lacks merit.

"A district court's denial of leave to amend is reviewed for an abuse of discretion." *Simmons v. Sabine River Auth. La.*, 732 F.3d 469, 478 (5th Cir. 2013). "Although leave to amend under Rule 15(a) is to be freely given, that generous standard is tempered by the necessary power of a district court to manage a case." *Schiller v. Physicians Res. Grp., Inc.*, 342 F.3d 563, 566 (5th Cir. 2003). A district court does not abuse its discretion in denying leave where claims against new defendants are barred by the statute of limitations. *See Whitt*, 529 F.3d at 282-83.

Appellants' argument lacks merit for the same reason their claims against Cuellar and Huddleston are untimely. Appellants had to add Hinojosa and Wheeler by April 27, 2015. *See id.* Appellants did not seek leave to add Hinojosa and Wheeler until February 18, 2016. The only grounds Appellants gave for their failure to do so is that Appellants "did not know the identities" of Wheeler or Hinojosa until conducting discovery. Again, Rule 15(c) requires a "*mistake* concerning the identity of a party." *See Jacobsen*, 133 F.3d at 321. "[F]ailing to identify individual defendants cannot be characterized as a mistake." *Id.*

The district court did not abuse its discretion in denying leave to amend because those claims were futile as barred by the statute of limitations.

## III. A Material Fact Issue Exists as to Hinds's Qualified Immunity

The district court determined that Hinds was entitled to qualified immunity because he had "probable cause" to believe that Gabriel "posed a threat of serious bodily harm." Appellants argue that in reaching that conclusion, the district court "improperly gave greater credence to Hinds's evidence regarding the reasonableness of the force that he used." We agree. Before addressing the merits of Hinds's qualified immunity claim, we first address the district court's refusal to consider Henry's affidavit testimony.

### A. Henry Winzer's Affidavit

The district court disregarded Henry's affidavit under the "sham affidavit" doctrine, concluding it contradicted statements in Henry's original complaint. This was an abuse of discretion. *See Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 615 (5th Cir. 2018) ("A district court abuses its discretion when its [evidentiary] ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence.").

Under the sham affidavit doctrine, a district court may refuse to consider statements made in an affidavit that are "so markedly inconsistent" with a prior statement as to "constitute an obvious sham." *Clark v. Resistoflex Co., A Div. of Unidynamics Corp.*, 854 F.2d 762, 766 (5th Cir. 1988); *see also Aerel, S.R.L. v. PCC Airfolis, L.L.C.*, 448 F.3d 899, 907 (6th Cir. 2006) (stating that the sham affidavit rule is only appropriate where an affidavit "directly contradicts" prior testimony); *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980) (finding that the sham affidavit rule was inappropriate because the affidavit was not "inherently inconsistent" with prior testimony). However, not "every discrepancy" in an affidavit justifies a district court's refusal to give credence to competent summary judgment evidence. *Kennett-Murray*, 622 F.2d

at 893. Generally, "[i]n considering a motion for summary judgment, a district court must consider all the evidence before it and cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier" statement. *Id.* "In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made" earlier. *Id.*

There is nothing inherently inconsistent between Henry's original complaint and the summary judgment affidavit.[6] The complaint stated that Gabriel "had" a plastic toy gun and that he "rode out on a 10 speed bicycle to show [the officers] the toy gun," but contained no factual allegation regarding where Gabriel "had" the gun as he rode the bike. Henry Compl. 4. Meanwhile, the affidavit says that Gabriel was "playing with a bright orange toy gun," but further explains that "Gabriel did not have anything in his hands, including the toy gun, while he was on the bike." Instead, Gabriel "had both hands on the handle bars of his bike" and "did not move his hands in any way that might have suggested he was reaching for something." It is entirely possible that Gabriel rode out on his bicycle with the toy gun in his waistband (or elsewhere on his person) and had his hands on the handlebars of his bicycle at all relevant times.[7] Because these statements can be "reconciled," there is no sham. *See*

---

[6] We cannot join with the dissent's accusation that Henry "[c]onveniently" altered details to "create the key factual dispute." Henry's original "complaint" was a five sentence, hand-written statement placed into the limited space of a form-petition for *pro se* litigants. *See* Henry Compl. 4. Thus, it is no surprise that Henry failed to include every pertinent factual detail to his claims. We will not punish Henry for the clear, non-conflicting benefit he received by attaining competent counsel. Indeed, the affidavit is entirely consistent with the third amended complaint, which was drafted with the assistance of counsel and was the live pleading at the time of Hinds's motion.

[7] It is not a "clear implication" from the complaint, as the dissent asserts, that Gabriel "was holding [the gun] out" as he rode his bike to show the toy gun to the officers. One does not necessarily, nor even normally, "hold out" an object in front of them as they traverse over 100 yards, on a bicycle, to show an object to another. Especially when that object is a toy gun

No. 16-11482

*Robinson v. Nexion Health at Terrell, Inc.*, 671 F. App'x 344, 344 (5th Cir. 2016) (reconcilable affidavits cannot be sham).

Moreover, while the affidavit significantly supplements the complaint factually, it contradicts nothing. We have held that the sham affidavit doctrine is inappropriate where an "affidavit supplements, rather than contradicts" an earlier statement. *Clark*, 854 F.2d at 766. At most, the affidavit creates a credibility issue for Henry's version of the facts. Such credibility determinations, however, are for the trier of fact, not the district court. *See Kennett-Murray*, 622 F.2d at 894; *Tarver v. City of Edna*, 410 F.3d 745, 753 (5th Cir. 2005) ("Any credibility determination made between the officers' and [Henry's] version of events is inappropriate for summary judgment.").

Thus, the district court abused its discretion in applying the sham affidavit doctrine to exclude Henry's competent summary judgment evidence. *See Williams*, 898 F.3d at 615; *Clark*, 854 F.2d at 766; *Kennett-Murray*, 622 F.2d at 894. "The harmless error doctrine applies to the review of evidentiary rulings, so even if a district court has abused its discretion, [this court] will not reverse unless the error affected 'the substantial rights of the parties.'" *See Williams*, 898 F.3d at 615 (internal citations and quotation marks omitted). However, an error is not harmless where, as here, it affected Appellants' substantial rights by "tipp[ing] the balance" of the outcome at summary judgment and thereby severely inhibiting their ability to assert their claim. *See Dartez v. Fibreboard Corp.*, 765 F.2d 456, 469 (5th Cir. 1985) (finding an evidentiary ruling affected substantial rights where it "tipped the balance in favor of finding liability"); *see also E.E.O.C. v. Manville Sales Corp.*, 27 F.3d 1089, 1094–95 (5th Cir. 1994) (finding an evidentiary ruling affected

---

and the individual is approaching a group of armed police officers. Perhaps more significantly, that "clear implication" is directly contrary to the complaint's allegation that Gabriel was "an unarmed man." Henry Compl. 3.

12

substantial rights where it "directly impact[ed] the ability of [the plaintiff] to enforce his rights"). We conclude that the district court's exclusion of Henry's affidavit was an abuse of discretion that affected the Winzers' substantial rights. Accordingly, in analyzing the qualified immunity issue below, we consider the facts as stated in Henry's affidavit.

## B.    Qualified Immunity

"To determine whether qualified immunity applies, [we] engage[] in a two-part inquiry asking: first, whether '[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right;' and second, 'whether the right was clearly established.'" *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). We have discretion to address either prong of the qualified-immunity inquiry first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (noting that "the two-step procedure promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable"). "[U]nder either prong, [we] may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). "[We] must view the evidence 'in the light most favorable to the opposing party.'" *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

## 1.    Violation of A Constitutional Right

In the first prong of a qualified immunity analysis, we must "answer the constitutional violation question by determining whether the officer's conduct met the Fourth Amendment's reasonableness requirement." *Lytle v. Bexar Cnty., Tex.,* 560 F.3d 404, 410 (5th Cir. 2009).

Under the Fourth Amendment, "it is unreasonable for an officer to 'seize an unarmed, nondangerous suspect by shooting him dead.'" *Brosseau v.*

*Haugen*, 543 U.S. 194, 197 (2004) (quoting *Tennessee v. Garner,* 471 U.S. 1, 11 (1985)). "It is not, however, unconstitutional on its face." *Garner*, 471 U.S. at 11. "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.*

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "[I]ts proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* This reasonableness inquiry is an objective one. *Id.* at 397. "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* We only consider facts that were "knowable" to Hinds. *See White v. Pauly*, 137 S. Ct. 548, 550 (2017).

The district court concluded that "a reasonable officer on the scene . . . could have easily drawn the inference that the black man cycling towards five armed police officers, disregarding their orders to drop his weapon, and raising his arm in their direction was the same black man who had so brazenly fired upon them just around the corner." The errors in the district court's analysis are myriad.

First, as discussed above, the central error is the district court's failure to credit Henry's testimony, instead adopting the officers' characterization of the events preceding the shooting. This alone is reversible error. *See Tolan*, 134 S. Ct. at 1866 (reversing qualified immunity analysis at summary

14

judgment stage where this court failed to view the evidence in the light most favorable to the non-moving party).

Second, the district court improperly concluded that Gabriel was "raising his arm" towards the police. This is directly contrary to Appellants' summary judgment affidavit, which claims that "Gabriel had both hands on the handle bar of his bike." Further, Henry claims that "Gabriel did not point anything towards the deputies" and "did not move his hands in any way that might have suggested that he was reaching for something." The district court should have viewed these statements "in the light most favorable" to Appellants in determining whether an objectively reasonable officer would have concluded that Gabriel posed an "immediate threat" to the safety of the officers or others. *See Tolan*, 134 S. Ct. at 1866; *Graham*, 490 U.S. at 396; *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 493 (5th Cir. 2001) (stating that the excessive force inquiry is confined to whether the officer "was in danger *at the moment of the threat* that resulted in the [officer's] shooting [the victim]").

Third, the district court ignored facts in the record casting doubt on whether a reasonable officer would have concluded that the "black man cycling towards [the officers] . . . was the same black man who had so brazenly fired upon them" earlier. For instance, Hinds had informed Cuellar that the suspect who fired the shots was "wearing a brown shirt." In fact, the officers repeatedly informed each other that the suspect was in a "brown shirt." The man on the bike, however, was wearing a blue jacket.[8] Further, the officers had no indication at all that the dangerous suspect, who had fired a shot at Hinds and Hinojosa earlier, had a bicycle. Moreover, the man on the bike was over 100 yards away and there had been numerous civilians in the area throughout the

---

[8] After the shooting, one of the officers stated that "he was in blue, that's what threw me off."

15

encounter. A jury could conclude that a reasonable officer would not have determined that Gabriel was the dangerous suspect. *See Lytle*, 560 F.3d at 412-13 (finding genuine fact issues as to whether an officer's firing at approaching vehicle was unreasonable, even if vehicle posed a threat to officer, where shots fired in residential area could pose risk to civilians).

Fourth, the district court's conclusion that Gabriel "disregard[ed] their orders to drop his weapon," aside from improperly concluding on summary judgment that Gabriel had a weapon, is contradicted by the video evidence, which shows the officers fired on Gabriel within a second of shouting to "put that down!" The video further shows that Gabriel turned a tree-lined corner on his bicycle (that could possibly have obstructed his view of the officers), made a child-like "figure 3," and then only momentarily headed towards the officers before being shot. It is far from clear that Gabriel had the opportunity to be deterred by the officers' warnings or to even register their commands. *See Trammell*, 868 F.3d at 342 ("[T]he quickness with which the officers resorted to" deadly force "militates against a finding of reasonableness.").

Statements audible in the video further demonstrate Hinds's lack of reasonableness. Seconds prior to the shooting, an officer appears to state that Gabriel "had that gun,"[9] while another shouts to "put that down!" Though these statements weigh in Hinds's favor, they must be balanced against competing evidence that Gabriel did not match the suspect's description, did not have anything in his hands, had both hands on the handlebar of his bike, and did

---

[9] We note that there are conflicting facts regarding the gun Gabriel "had" at the time of the shooting. Henry claims that Gabriel had a "bright orange toy gun." The officers, however, claim the gun was "dull colored," "dark colored," or "silver," depending on whose affidavit you consult. Henry later tossed a toy gun towards the officers when the officers entered the Winzer's backyard to secure Gabriel. There is no evidence that any real firearm was ever found in Gabriel's possession or anywhere in his path.

not reach for anything. They must further be balanced with the undisputed facts that Gabriel was over 100 yards away, on a bicycle, and slowly approaching five officers barricaded behind three vehicles and with high powered rifles drawn and ready.[10] It is for a jury to determine whether a reasonable officer on the scene, when confronted with these facts, would have determined that Gabriel posed such an imminent risk to the officers that use of deadly force was justified within seconds of his appearance.

Given the district court's multifarious errors, and that we must consider the facts in the light most favorable to Appellants, we conclude that it is proper to consider only the following facts in determining whether an objectively reasonable officer would have believed that Gabriel posed an imminent threat and whether Hinds's use of force was constitutional. Hinds responded to a 911 call of a man with a gun. The suspect was a black male, afoot and wearing a brown shirt. Upon Hinds's arrival, the suspect fired a shot at Hinds and Hinojosa. Hinds then lost sight of the suspect. The officers encountered numerous civilians along the road as they searched for the suspect. The officers eventually set up a defensive barrier complete with three vehicles, five officers, four semiautomatic rifles, and a shotgun on a road in the vicinity of the suspect's last known location. Minutes later, Gabriel, on his bike and dressed in blue, not brown, appeared on the same street as the last known location of the suspect. Gabriel was riding his bicycle more than 100 yards away. Further,

---

[10] The dissent would likewise violate *Tolan*, stating that Hinds acted reasonably because Gabriel was "riding headlong" at the officers. Yet, there is no evidence that Gabriel was "riding headlong" at the officers. Henry claims that Gabriel was "on his bike." The officers, for their part, state only that Gabriel was "coming" towards them while "riding" a bicycle. The video likewise shows that Gabriel dawdled slightly before turning toward the officers. In fact, accepting Henry's claim that Gabriel did not raise his arm towards the officers, as we must, there is no evidence indicating that the officers reasonably believed that Gabriel made any aggressive movements whatsoever prior to the shooting.

No. 16-11482

Gabriel did not have anything in his hands, had both hands on the handlebar of his bike, did not reach for anything, did not point anything towards the deputies, and was unarmed. Nonetheless, an officer stated that Gabriel "had that gun," while another screamed "put that down!" Hinds opened fire on Gabriel within seconds of spotting him.[11]

While "[w]e are loath to second-guess the decisions made by police officers in the field," *see Vaughan v. Cox*, 343 F.3d 1323, 1331 (11th Cir. 2003) (citing *Graham*, 490 U.S. at 396–97), we conclude that a jury could find that the use of deadly force was unreasonable if it credited and drew reasonable inferences from the Winzers' account.  Accordingly, Hinds was not entitled to qualified immunity under the first prong.

### 2.    Clearly-Established Law

Having determined that there are genuine issues of material fact with respect to whether Hinds's use of deadly force was objectively reasonable, the question remains "whether the right was clearly established at the time of the conduct." *Lytle*, 560 F.3d at 410.  The Supreme Court has held that we cannot "define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 732, 742 (2011). This inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Brosseau*, 543 U.S. at 198–99). The Supreme Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. Under this exacting standard, we cannot

---

[11] Contrary to the dissent's claim that we impose a 20/20 hindsight analysis, these facts are construed from Hinds's perspective at the time of the shooting, while also taking into account our duty to construe the evidence in the light most favorable to the non-moving party.

18

conclude that Gabriel's right to be free from excessive force was clearly established here.

## IV.    Summary Judgment Premature for Kaufman County

The district court granted summary judgment in favor of Kaufman County based on its ruling that there was no constitutional violation and the officers were entitled to qualified immunity. *See Hicks-Fields v. Harris Cty., Texas*, 860 F.3d 803, 808 (5th Cir. 2017) ("[T]o establish municipal liability under § 1983, a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right."). Because we determine that there are genuine issues of fact as to whether there was a constitutional violation, we reverse the district court's grant of summary judgment to the county as premature and remand to the district court for reconsideration.

## CONCLUSION

For these reasons, we REVERSE the district court's grant of summary judgment to the county and REMAND for consideration in light of this opinion. We otherwise AFFIRM.

No. 16-11482

EDITH BROWN CLEMENT, Circuit Judge, dissenting in part.

The majority has correctly concluded that Officer Hinds is entitled to qualified immunity due to the lack of clearly established law. But en route to this decision, it has taken an unnecessarily difficult path, disregarding the deference long afforded to district courts' evidentiary rulings and misapplying well-worn qualified immunity standards. In light of these significant errors, I dissent from sections III(A), III(B)(1), and IV of the opinion.

I.

As to the evidentiary error, the majority seems to concede that if Gabriel was pointing the gun (or toy gun) at the officers, Officer Hinds's decision to shoot should be protected. But it concludes that the district court erred when it rejected an affidavit from Gabriel's father, Henry, which stated that no gun was in view. This failure to admit the affidavit and credit its version of the incident was apparently the "central error" of the court's analysis. The majority thus bases its conclusion that a constitutional violation may have occurred on a five-page document—submitted one month after Officer Hinds's motion for summary judgment—that contravenes the unanimous observation of the witnessing officers recorded in their sworn statements and in video-recorded utterances prior to the shooting, and, as addressed more thoroughly below, Henry's *own* initial complaint.[1]

The problems with the majority's analysis stem from an unfaithful application of the standard of review. We are told that the applicable

---

[1] Note that in framing the dispute over the affidavit, the majority opinion errs by presenting certain facts from the affidavit as if they are beyond dispute. For example, the majority baldly asserts that Gabriel "was inside his father's house and did not fire" at the police officers during their initial encounter with the suspect. But the sole source for this fact is the contested affidavit. It therefore belongs among the "highly disputed" facts which come later in the opinion.

standard—review for abuse of discretion—requires the court to find a "clearly erroneous assessment of the evidence" that affected substantial rights. Accordingly, as the majority concedes, the key question here is not whether the district court merely erred when it concluded Henry Winzer's affidavit was a sham; rather, it is whether the district court abused its discretion in doing so. The answer: No, it obviously did not.

"It is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996); *see also Vincent v. Coll. of Mainland*, 703 F. App'x 233, 238 (5th Cir. 2017) ("Conclusory, self-serving affidavits are insufficient to create a fact issue when they contradict prior testimony."). Accordingly, the district court may appropriately reject such statements that create a clear discrepancy with prior accounts—especially when no explanation for the conflict is offered. *See Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir. 1984).

Henry Winzer's initial, pro se complaint—challenging the officers' use of force—stated that Gabriel "had a plastic toy cap gun" and "rode out on a 10 speed bicycle to show [the officers] the toy gun." A clear implication of this observation is that Gabriel was holding out the object "to show them" the toy, or at a minimum that the toy would have been visible to the officers. The majority's suggested interpretation to the contrary (leaving open the possibility that the gun was concealed) may be an acceptable one, but it does not follow that the district court's similarly reasonable interpretation of the

complaint was wrong. At the very least, it was not an abuse of discretion for the district court to interpret the statement as it did.[2]

Henry Winzer's first account was compatible with the unanimous testimony of the police officers on the scene. Then, one month after defendants' summary judgment motion and after Henry Winzer obtained counsel, the court received a new affidavit that told a different story. As it turns out, Henry Winzer's initial account was mistaken: Gabriel's hands were on the bike's handlebars at the time of the shooting, and the gun was not otherwise visible.[3] No explanation for this new version of the story was offered.

This case presents the appropriate circumstances for an application of the sham affidavit doctrine. In response to a summary judgment motion and with the aid of counsel, Henry added material details in an affidavit that significantly changed the story he described in his original complaint. Conveniently, every altered detail served to create the key factual dispute that, according to the majority, could result in a finding of a constitutional violation. The district court correctly disregarded the affidavit as a sham. The majority's conclusion—after a lengthy discussion relying on a strained reading of the complaint—that it was an *abuse of discretion* for the district court to so

---

[2] The majority suggests that it would be abnormal for someone to hold out an object in front of them as they ride a bicycle towards a group of individuals to show them the object. They say that is especially true "when that object is a toy gun" and the group being approached is formed of armed police officers. But riding a bicycle toward a group of police officers with any type of gun is abnormal when gunshots had just been fired, the officers were obviously in a defensive posture, and the officers had just told all civilians to return to their homes. Yet that is indisputably what occurred. The majority does not seem to appreciate the tragic reality that Gabriel's actions—even accepting Henry's version as true—were strange and dangerous. Officer Hinds's reaction to Gabriel's unusual behavior, on the other hand, was reasonable.

[3] Notably, the affidavit also includes facts that would have no significance unless it were possible for the police officers to see the gun. For example, it notes that "[i]t was clearly apparent that the gun Gabriel *had in his hand* was not real, based on the color and make of it." (Emphasis added.)

conclude is puzzling. After all, even if the district court's assessment of the inconsistency between the complaint and the affidavit was wrong, we cannot say that its assessment was "clearly erroneous."

## II.

If the district court is correct about the affidavit, then the record evidence suggests Gabriel had a gun (or toy gun) in his hand as he rode towards the officers. In that case, it should be beyond dispute that Officer Hinds rightfully received immunity for his decision to shoot. But suppose this is wrong. Suppose instead that the court was required to accept Henry's affidavit and to credit his observation that Gabriel rode out to the police officers with both hands on his bike. What then?

The result should be the same: Officer Hinds was still entitled to this court's recognition that his behavior was reasonable. In concluding otherwise, the majority misapprehends qualified immunity—both its first principles and specific legal standards—and has endangered Officer Hinds's (and future law enforcement officers') rightful claim to it. *See White v. Pauly*, 137 S. Ct. 548, 551–52 (2017) (explaining that, because qualified immunity is "an immunity from suit," the protection "is effectively lost if a case is erroneously permitted to go to trial" (internal quotation marks omitted)).

### A. *Reviewing the Qualified Immunity Standard*

Before turning to a specific critique of the majority's conclusions, it is worth highlighting the fundamental tenets of qualified immunity, since those tenets recede to the background of the opinion. Qualified immunity is grounded in the acknowledgment that officers must make split-second judgments about the appropriate use of force in chaotic, highly dangerous situations. *Graham v. Connor*, 490 U.S. 386, 397 (1989). It is designed to protect "officials from harassment, distraction, and liability when they perform their duties

reasonably," *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (noting that this protection was "the driving force" behind the doctrine's creation), and to allow them "breathing room to make reasonable but mistaken judgments about open legal questions," *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Accordingly, "once properly raised by the [officer], the 'plaintiff has the burden to negate the assertion of qualified immunity.'" *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016) (quoting *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009)).[4]

Both prongs of the qualified immunity standard are imbued with this deference and respect. First, "[a]n officer's use of deadly force is presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others." *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009). Notably, "[t]he reasonableness of the use of deadly force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (internal quotation omitted). The focus is only on what was "knowable" to the individual officer at the time. *White*, 137 S. Ct. at 550. And, most importantly, our definition of "reasonableness" cannot be grounded on what, upon reflection "in the peace of a judge's chambers," seems necessary; rather, it is defined by the chaotic circumstances into which officers are thrust. *Graham*, 490 U.S. at 396–97 (internal quotation omitted). As the Supreme Court has long emphasized, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*

---

[4] Notably, the majority opinion fails to even acknowledge this burden.

No. 16-11482

Similarly, the "clearly established" prong protects officers from having to parse nuances in case law from various courts and jurisdictions to discover the bounds of their conduct. Accordingly, our "inquiry . . . is whether, under the law in effect at the time [of the shooting], no reasonable officer could have believed deadly force was lawful." *Manis v. Lawson*, 585 F.3d 839, 846 (5th Cir. 2009). The officer loses protection only if his conduct violates "controlling authority" or "a robust consensus of cases of persuasive authority." *al-Kidd*, 563 U.S. at 741–42 (internal quotation marks omitted). Notably, that guidance must be finely tuned to the specific "circumstances with which [the officer] was confronted." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). An unreasonable mistake of law regarding the excessive use of force requires "existing precedent [that] squarely governs *the specific facts at issue*." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (emphasis added) (internal quotation marks omitted). We have "repeatedly" been told we are not permitted "to define clearly established law at a high level of generality." *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775–76 (2015) (quoting *al-Kidd*, 563 U.S. at 742).

Having set forth these principles, the specific problems in the majority's conclusions become obvious. The majority fundamentally misapprehends this guidance and has reached a result on the reasonableness prong that is, simply put, wrong.

B. *Officer Hinds committed no constitutional violation*

The majority failed to give due weight to the tense circumstances surrounding Officer Hinds at the time of his decision to shoot. Instead, the majority argues that Officer Hinds unreasonably misdiagnosed the danger he faced by highlighting certain "competing evidence" to show that the officer could have—should have—known that Gabriel was not a threat. Notably, the majority uses the accelerated timeline of events against Officer Hinds when

discussing evidence that suggests he behaved reasonably, but then repeatedly faults Officer Hinds for insufficiently considering other factors that existed only fleetingly before the shooting began. The majority's implicit suggestion that Officer Hinds could not reasonably have relied on video-recorded utterances immediately prior to the shooting in making his decision is just one example. In other words, the majority imposes the sort of 20/20 hindsight analysis that we have forbidden. *Cf. Ontiveros*, 564 F.3d at 384–85 (circumstantial evidence that provided an innocuous explanation for a suspect's actions did not override a reasonable interpretation to the contrary by an officer).

Here is Officer Hinds's position based on the uncontroverted facts: He was responding to a dispatch that a man was recklessly shooting his firearm in a residential area, threatening the lives of innocent civilians in their homes. Upon Officer Hinds's arrival, the individual shot his gun at him without provocation from a distance of 100–150 yards. The suspect then ran from Officer Hinds, darting into private property for cover. In other words, an extremely dangerous individual with a gun was at large in a residential neighborhood, posing an immediate and serious threat to the lives of civilians and police officers.

Officer Hinds and his fellow officers rightfully proceeded with caution. They slowly moved up the road with guns drawn, using their vehicles for protection. They directed the innocent civilians they passed to remain in their homes while they pursued the suspect. Using their PA system, the officers also commanded the suspect to come out of hiding and surrender. No response.

No. 16-11482

Suddenly, an individual appeared on a bike close to where the suspect had last been seen, riding headlong at the police officers.[5] The individual continued towards the officers, undeterred both by their prior warnings to innocent civilians to stay in their homes and by their commands to the suspect to come out and surrender. He was also undeterred by the fact that Officer Hinds and his fellow officers were in a defensive position with their guns drawn. Gabriel was approximately 100 yards from Officer Hinds at the time—a similar distance from which the suspect had just shot at him. As Gabriel got closer, one of the officers warned his colleagues that Gabriel had a gun. Another screamed, "Put that down!" Then shots were fired.

Words are imperfect vessels for capturing the chaos of such moments (the video recording does a better job of conveying the tension). But all of this happened. The events are undisputed.

It should come as no surprise that all of the officers on the scene, including Officer Hinds, stated that they feared for their safety and the safety of others at that critical moment. And there was nothing unreasonable about Officer Hinds's decision to shoot. In that split second, Officer Hinds was justified in concluding that the individual riding at them while their guns were drawn was the armed suspect. He had just heard that Gabriel was holding a gun. And his own experience with the suspect, as well as his knowledge that the suspect had been shooting at his neighbors' mailboxes, justified his thought

---

[5] The majority takes issue with this account of the facts, claiming it unfairly favors Officer Hinds. But its arguments in support are unpersuasive. The majority claims that the dissent mischaracterizes Gabriel's actions to say he rode headlong at the officers. According to my colleagues, the record supports only the inference that Gabriel was "coming" towards the officers "while 'riding' a bicycle." There is no meaningful distinction between these accounts, let alone one that unfairly favors Officer Hinds.

27

that Gabriel posed a serious threat to his own, his fellow officers', and other civilians' safety.[6] Regardless of any factual dispute regarding the visibility of the gun Gabriel possessed or the color of his shirt, Officer Hinds cannot be faulted for acting out of a reasonable desire to protect himself and the neighborhood by pulling the trigger. None of the countervailing concerns noted by the majority undercuts this conclusion. Officer Hinds clearly "ha[d] reason to believe that the suspect pose[d] a threat of serious harm to [him] or to others." *Ontiveros*, 564 F.3d at 382. He acted on that reasonable belief. There was no constitutional violation.

Critically, the majority's counternarrative of the pivotal moment includes subjective evaluations that could only be discerned after a nuanced, repeated review of the video evidence. For example, we are told that Gabriel "made a child-like 'figure 3'"—instead of a more mature straight line, apparently— and "dawdled slightly" before turning toward the officers. These details regarding direction, posture, and speed are not obvious from a review of the footage in the quiet of an office. But the majority's imputation of such fine distinctions into its analysis of what a reasonable officer should do when faced with a split-second, life-or-death decision in real time is particularly misguided. *See Graham*, 490 U.S. at 396–97.

In short, this dissent has simply looked at all of the knowable—and uncontroverted—facts available to Officer Hinds. And, after using the

---

[6] The majority seems to think that innocent civilians were at risk by the officers' actions, relying on *Lytle v. Bexar County*, 560 F.3d 404 (5th Cir. 2009) for support. Its analogy to this case is forced. The court in *Lytle* found that it would be unreasonable for an officer to fire at the back of a car four houses down a residential block that was travelling away from him in part due to the risk "that the shots might strike an unintended target." *Id.* at 412–13. The circumstances here are very different: the officers took extensive precautions to ensure all innocent civilians were out of harm's way.

appropriate sensitivity required to analyze such decisions, it has concluded that the plaintiffs failed to meet their burden to show his actions were objectively unreasonable. By contrast, despite the majority's assurance that it is "loath to second-guess the decisions made by police officers in the field" from a privileged position of comfort, *see Graham*, 490 U.S. at 396–97, this is precisely what it has done.

The majority's analysis flouts well-established legal guideposts and omits applicable burdens. Its conclusion that Officer Hinds may have behaved unreasonably is not persuasive. Fortunately, the majority at least gets the second prong of the qualified immunity analysis right. But its failure to accord appropriate deference to Officer Hinds on the first prong is not only misguided—it invites future error. And because the majority errs on the reasonableness prong, Kaufman County is also denied the summary judgment which is clearly appropriate.

\* \* \*

The implications of the majority's mistakes cannot be minimized. The majority decides that qualified immunity can be endangered by an affidavit filed at summary judgment that creates a fact issue nowhere else supported by record evidence.

Worse still, it seriously undermines officers' ability to trust their judgment during those split seconds when they must decide whether to use lethal force. Qualified immunity is designed to respect that judgment, requiring us to second-guess only when it clearly violates the law. The standard acknowledges that we judges—mercifully—never face that split second. Indeed, we never have to decide anything without deliberation—let alone whether we must end one person's life to preserve our own or the lives of those around us.

The qualified immunity standard stops this privilege from blinding our judgment, preventing us from pretending we can place ourselves in the officers' position based on a cold appellate record. It prevents us from hubristically declaring what an officer should have done—as if we can expect calm calculation in the midst of chaos.

The majority opinion, written from the comfort of courthouse chambers, ignores that deference. Instead, it warns officers that they cannot trust what they see; they cannot trust what their fellow officers observe; they cannot trust themselves when posed with a credible threat. It instructs them, in that pivotal split second, to wait. But when a split second is all you have, waiting itself is a decision—one that may bring disastrous consequences.

Hopefully, these errors will be corrected before we face their effects. In the meantime, I dissent.