**REVISED January 13, 2020**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 18-51011

United States Court of Appeals
Fifth Circuit
**FILED**
January 9, 2020

Lyle W. Cayce
Clerk

BRETT HORVATH,

> Plaintiff - Appellant

v.

CITY OF LEANDER, TEXAS; BILL GARDNER, Fire Chief, in his official and individual capacities,

> Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, DENNIS, and HO, Circuit Judges.[1]

JAMES L. DENNIS, Circuit Judge:

Brett Horvath was employed as a driver/pump operator by the City of Leander Fire Department. In 2016, the Fire Department began requiring TDAP vaccinations, to which Horvath objected on religious grounds. He was given a choice between two accommodations: transfer to a code enforcement job that did not require a vaccination, or wear a respirator mask during his shifts, keep a log of his temperature, and submit to additional medical testing.

---

[1] Judge Ho concurs in the judgment as to Sections III.A and III.B and dissents as to Section III.C, for the reasons expressed in his separate opinion.

No. 18-51011

He did not accept either accommodation and was fired by Fire Chief Bill Gardner for insubordination. Horvath filed suit against Chief Gardner and the City, alleging discrimination and retaliation in violation of Title VII and the Texas Commission on Human Rights Act (TCHRA), and violations of 42 U.S.C. § 1983 premised on violations of his First Amendment Free Exercise rights. The district court granted summary judgment to defendants on all claims. We affirm.

## I.

Brett Horvath is an ordained Baptist minister and objects to vaccination as a tenet of his religion. He was hired as a firefighter by the City of Leander Fire Department on April 7, 2012. In 2014, the Department adopted an infection control plan that directed fire department personnel to receive flu vaccines. Horvath sought an exemption from the directive on religious grounds, and the exemption was approved by Chief Gardner on the condition that Horvath use increased isolation, cleaning, and personal protective equipment to prevent spreading the flu virus to himself, co-workers, or patients with whom he may come into contact as a first responder.

In 2015, Horvath was promoted from firefighter to driver/pump operator, which involved driving fire personnel to the scene of an emergency, plus general firefighter duties such as responding to rescue and fire suppression scenes and performing first responder duties for medical and non-medical emergencies. In 2015, as driver/pump operator, Horvath sought and received another exemption from the flu vaccine directive.

In 2016, the City mandated that all personnel receive a TDAP vaccine, which immunizes from tetanus, diphtheria, and pertussis or whooping cough. On January 14 and 20, 2016, Horvath sought an exemption from the directive on religious grounds. After months of discussions, on March 17, 2016, the City finalized its accommodation proposal and gave Horvath two options—he could

No. 18-51011

be reassigned to the position of code enforcement officer, which offered the same pay and benefits and did not require a vaccine, and the City would cover the cost of training; or he could remain in his current position if he agreed to wear personal protective equipment, including a respirator, at all times while on duty, submit to testing for possible diseases when his health condition justified, and keep a log of his temperature. The City gave Horvath until March 24, 2016 to decide.

On March 21, Horvath declined the code enforcement job and suggested an alternative accommodation that would allow him to remain a driver/pump operator. He agreed with all of the City's requirements except the requirement that he wear a respirator at all times; he instead proposed to wear it when encountering patients who were coughing or had a history of communicable illness. Chief Gardner refused to renegotiate and sent a letter to Horvath that day, repeating the original proposal and giving Horvath until March 28 to decide whether he "agree[d] to the accommodations as presented or [would] receive the vaccines."

On March 23, Horvath again rejected both options and re-urged his alternative proposal—wearing the mask only at times he thought it was medically necessary. He stated that he could not find any evidence based on medical authority that wearing the mask constantly is recommended infection control procedure in lieu of a TDAP vaccine, but if Chief Gardner had evidence to the contrary, he was willing to review it and consider changing his position. As for the code enforcement position, Horvath believed it involved a much less favorable work schedule and less desirable job duties and therefore was not a reasonable accommodation.

On March 28, Chief Gardner asked the assistant fire chief to investigate and determine if Horvath's failure to select one of the City's accommodations, or to decline them, was in violation of a directive given by the fire chief,

No. 18-51011

constituting willful disobedience or deliberate refusal to obey a directive from a supervisor, in violation of the City's Code of Conduct. Later that same day, the assistant fire chief interviewed Horvath and determined that Horvath deliberately refused to obey a directive from a supervisor, which constituted insubordination in violation of the City's Code of Conduct. The next day, on March 29, Chief Gardner terminated Horvath's employment for violating the Code of Conduct.

Horvath filed suit, alleging discrimination and retaliation in violation of Title VII and the TCHRA, and a violation under 42 U.S.C. § 1983 of his First Amendment right to freely exercise his religion.[2] The City and Chief Gardner moved for summary judgment, which the district court granted. Horvath timely appealed.

## II.

We review a grant of summary judgment de novo. *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). We view the facts in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.

## A.

We begin with Horvath's claim of religious discrimination under Title VII and the TCHRA:[3] that the City and Chief Gardner failed to offer a reasonable accommodation of his religious beliefs. Title VII makes it unlawful

---

[2] Horvath originally filed suit in Texas state court against only the City of Leander. After the City of Leander removed the case to federal court, Horvath amended his complaint to add claims against Chief Gardner, in both his official and individual capacity.

[3] We apply the same analysis to Title VII and TCHRA claims. *See NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999).

4

for an employer to discriminate against an employee on the basis of religion. 42 U.S.C. § 2000e-2(a)(1). "An employer has the statutory obligation to make reasonable accommodations for the religious observances of its employees, but it is not required to incur undue hardship." *Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 263 (5th Cir. 2000). "Title VII does not restrict an employer to only those means of accommodation that are preferred by the employee." *Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 501 (5th Cir. 2001). Once an employer has established that it offered a reasonable accommodation, even if that alternative is not the employee's preference, it has satisfied its obligation under Title VII as a matter of law. *Id.* The employer's offer of a reasonable accommodation triggers an accompanying duty for the employee: "An employee has a duty to cooperate in achieving accommodation of his or her religious beliefs, and must be flexible in achieving that end." *Id.* at 503.

Title VII and TCHRA claims are subject to the burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, a plaintiff must establish a prima facie case of religious discrimination. *Davis v. Fort Bend Cty.*, 765 F.3d 480, 485 (5th Cir. 2014). If the plaintiff makes such a showing, the burden shifts to the employer "to demonstrate either that it reasonably accommodated the employee, or that it was unable to [do so] without undue hardship." *Id.* (quoting *Antoine v. First Student, Inc.*, 713 F.3d 824, 831 (5th Cir. 2013)).

The City concedes that Horvath established a prima facie case of religious discrimination but argues that it offered Horvath two reasonable accommodations. The district court found that the City provided a reasonable

accommodation by offering to transfer Horvath to the code enforcement position in the department.[4]

In *Bruff*, we held that a medical center offered a reasonable accommodation to a counselor who sought to be excused from counseling on subjects that conflicted with her religious beliefs by "giv[ing] [her] 30 days, and the assistance of its in-house employment counselor, to find another position at the Center where the likelihood of encountering further conflicts with her religious beliefs would be reduced." *Bruff*, 244 F.3d at 501. The City's accommodation of Horvath here was more generous than that offered in *Bruff*. Rather than simply permitting Horvath to apply for different positions in the department, the City offered Horvath the opportunity to transfer to a code enforcement position that would not require him to receive vaccinations. The position offered the same salary and benefits as the driver/pump operator position.

Horvath argues, however, that fact questions exist as to whether the accommodation was reasonable because he believes the code enforcement officer position is the least desirable position in the department because of its duties and hours.[5] He also argues that the position was unreasonable because the schedule would prevent his continuing his secondary employment running a construction company, which would reduce his total income by half.

Neither of these arguments is convincing. While Horvath and other Leander firefighters may prefer the hours and duties of traditional firefighting

---

[4] Concluding that the first accommodation was reasonable, the district court declined to assess the reasonableness of the second proposed accommodation: wearing the respirator at all times during his shifts, keeping a log of his temperature, and submitting to additional medical testing

[5] A code enforcement officer works Monday to Friday during normal business hours, with occasional overtime on Saturdays, while driver/pump operators and other firefighters work twenty-four-hour shifts.

jobs, "Title VII does not restrict an employer to only those means of accommodation that are preferred by the employee." *Id.* And Horvath's reduction in his income due to loss of an outside job does not render the accommodation unreasonable. We found the accommodation reasonable in *Bruff* even though transferring would require the plaintiff "to take a significant reduction in salary." *Id.* at 502 n.23. It follows that allowing transfer to a position with equivalent salary, which may indirectly result in the loss of outside income, cannot be faulted. Though reasonableness may often be a question for the jury, the facts here "point so strongly and overwhelmingly in favor of [the City] that reasonable [jurors] could not arrive at a contrary verdict." *Id.* at 503. Summary judgment in favor of the City and Chief Gardner on Horvath's Title VII and TCHRA discrimination claims was proper and, accordingly, we affirm the district court in this respect.[6]

## B.

We turn next to Horvath's Title VII and TCHRA retaliation claims: that he was fired not for his refusal to accept the offer of accommodation but for his letter that sought further to negotiate a reasonable accommodation of his religious beliefs. We again apply the *McDonnell Douglas* burden-shifting framework. *See Davis*, 766 F.3d at 489. Assuming, as the district court did, that Horvath stated a prima facie case of retaliation, the City must respond with a legitimate, non-discriminatory reason for the firing. *Davis*, 765 F.3d at 490. This burden is one of production, not proof, as the ultimate burden of

---

[6] Because we determine that the City offered Horvath a reasonable accommodation by allowing him to transfer positions, we do not consider whether the City's second accommodation option, which involved wearing a respirator mask for twenty-four-hour periods, was reasonable, or if Horvath's request for a religious exemption created an undue hardship.

persuasion always remains with the employee. *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 235 (5th Cir. 2016).

The City argues that its legitimate, non-discriminatory reason for Horvath's termination was his defiance of a direct order by failing to select an accommodation to the TDAP vaccine policy. The district court found that "Horvath was terminated not for engaging in protected activity by opposing a discriminatory practice in a letter, but for failing to comply with a directive that conflicted with his religious beliefs." We agree. The City has proffered a legitimate, non-discriminatory reason for Horvath's firing—his defiance of a direct order by failing to select an accommodation. *See LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 390 (5th Cir. 2007) (finding that employer's stated reason for suspending employee—his failure to obey a direct order from his superiors—satisfied the second prong of *McDonnell Douglas*). Accordingly, we affirm the district court's grant of summary judgment on Horvath's retaliation claims.

## C.

We last turn to Horvath's Free Exercise claim that the City and Gardner violated his right to practice his religion through a policy requiring him to wear a respirator mask in lieu of taking the TDAP vaccine. The Free Exercise Clause, applied to the states by incorporation into the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I; *Fairbanks v. Brackettville Bd. of Educ.*, 218 F.3d 743 (5th Cir. 2000).

Municipal liability under § 1983 requires proof of (1) a policymaker, (2) an official policy, and (3) a violation of constitutional rights whose moving force is the policy or custom. *Rivera v. Hous. Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Horvath argues that (1) Chief Gardner was the policymaker; (2) the official

policy was "that any fire fighter who declined a Tdap booster on religious grounds would have to wear an N95 respirator for the entirety of each work shift in order to remain a fire fighter"; and (3) the policy violated Horvath's constitutional right to freely exercise his religion.

The district court found that the respirator requirement was not an official policy, but one of two accommodations offered to Horvath in light of his religious objection to the TDAP directive, and alternatively, even if the respirator requirement was an official policy, Horvath's right to freely exercise his religious beliefs was not burdened by the respirator requirement. We agree. While Horvath has a constitutional right to exercise his religion by refusing the TDAP vaccine because it conflicts with his sincerely held religious beliefs, he is able to exercise his religious beliefs while working for the City—either by remaining a firefighter and wearing a respirator or working as a code enforcement officer. We agree with the district court that the respirator proposal did not violate Horvath's right to freely exercise his religion—instead, it would have enabled him to freely exercise his religion while maintaining his current job. Accordingly, the district court properly entered summary judgment on Horvath's free exercise claims.[7]

---

[7] The dissent argues that *Smith* should not apply to Horvath's claim and would "remand for further proceedings to determine whether the city policy is indeed a neutral law of general applicability." We do not rely on *Smith* in deciding Horvath's claim, instead concluding, as the district court did, that Horvath's right to freely exercise his religious beliefs was not burdened at all by the proposed respirator accommodation that Horvath challenges.

The dissent also claims there are fact disputes as to whether the proposed respirator accommodation forces Horvath to make an "untenable choice" between sacrificing his faith or working under unequal conditions. A brief review of the cases relied on by the dissent reveals that they are inapposite. In both *Sherbert* and *Hobby Lobby*, the plaintiffs were forced to choose between compromising their religious beliefs and facing serious consequences—in *Sherbert*, foregoing unemployment compensation benefits; and in *Hobby Lobby*, forfeiting hundreds of millions of dollars a year by continuing to offer healthcare plans to employees without contraceptive coverage, or facing a competitive disadvantage in attracting skilled workers by dropping insurance coverage altogether. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 723 (2014); *Sherbert*, 374 U.S.398, 400, 404-05 (1963). Here, Horvath was not faced

No. 18-51011

* * *

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

with such an "untenable choice"—in lieu of getting a vaccine, Horvath could remain a firefighter and wear a respirator throughout his shift *or* become a code enforcement officer and maintain the same pay and benefits as his current position. We have already determined that the code enforcement position was a reasonable accommodation, and Horvath does not argue that this accommodation violates his free exercise rights. Moreover, the plaintiffs in the cases cited by the dissent challenged the policy that infringed on their free exercise rights; here, Horvath challenges not the City's general vaccine requirement that would require him to violate a sincerely held religious belief, but one of two accommodations the City proposed so that Horvath could avoid such a dilemma. Simply put, Horvath was not forced to choose between compromising his religious beliefs and "pay[ing] a very heavy price." *Hobby Lobby Stores, Inc.*, 573 U.S. at 691.

10

No. 18-51011

JAMES C. HO, Circuit Judge, concurring in the judgment in part and dissenting in part:

Civil rights leaders and scholars have derided *Employment Division v. Smith*, 494 U.S. 872 (1990), as "the *Dred Scott* of First Amendment law."[1] At least ten members of the Supreme Court have criticized *Smith*.[2] It is widely panned as contrary to the Free Exercise Clause and our Founders' belief in religion as a cornerstone of civil society.

*Smith* is nevertheless binding precedent. But we should not apply it where it does not belong. Under *Smith*, government may regulate religious activity, without having to satisfy strict scrutiny, so long as the regulation is a "neutral law of general applicability." 494 U.S. at 879. That rule does not apply, however, where government grants exemptions to some but not to others. Religious liberty deserves better than that—even under *Smith*.

Based on the record in this case, it is far from clear that the city's policy is a "neutral law of general applicability." There are factual disputes that make summary judgment inappropriate. I would accordingly vacate the judgment as to the Free Exercise claim against the city and remand for further proceedings.

---

[1] *Religious Freedom Restoration Act: Hearing on S. 2969 Before the S. Comm. on Judiciary*, S. Hrg. 102-1076, at 171 (Sep. 18, 1992) (statement of Nadine Strossen, President of the ACLU). *See also id.* at 42 (statement of Oliver S. Thomas on behalf of the Baptist Joint Committee and the American Jewish Committee) (same); Garrett Epps, *Elegy for a Hero of Religious Freedom*, THE ATLANTIC, Dec. 9, 2014 (comparing Alfred Smith to Dred Scott).

[2] *See, e.g., Kennedy v. Bremerton Sch. Dist.*, 139 S. Ct. 634, 637 (2019) (Alito, J., respecting the denial of certiorari) ("In [*Smith*], the Court drastically cut back on the protection provided by the Free Exercise Clause."); *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1734 (2018) (Gorsuch, J., concurring) ("*Smith* remains controversial in many quarters."); *City of Boerne v. Flores*, 521 U.S. 507, 544–45 (1997) (O'Connor, J., dissenting) ("*Smith* was wrongly decided."); *id.* at 565 (Souter, J., dissenting) ("I have serious doubts about the precedential value of the *Smith* rule and its entitlement to adherence."); *Smith*, 494 U.S. at 891 (O'Connor, J., concurring in the judgment); *id.* at 907 (Blackmun, J., dissenting).

No. 18-51011

But I would affirm the judgment as to the Free Exercise claim against the fire chief, because the doctrine of qualified immunity bars that claim. Under that doctrine, a plaintiff cannot recover against a public official unless (1) the official violated the plaintiff's rights, and (2) the law is "clearly established" at the time of the violation.

I would welcome a principled re-evaluation of our precedents under both prongs. *See Cole v. Carson*, 935 F.3d 444, 477 (5th Cir. 2019) (en banc) (Ho & Oldham, JJ., dissenting). The second prong has been widely criticized, and for good reason: Neither the text nor the original understanding of 42 U.S.C. § 1983 supports the "clearly established" requirement. *Cf. Wilson v. City of Southlake*, 936 F.3d 326, 333 (5th Cir. 2019) (Ho, J., concurring in the judgment) (declining to extend exigent circumstances defense for police officers where text contains no such defense). In addition, courts too often misuse the first prong, finding constitutional violations where none exist as an original matter. *See, e.g., Cole*, 935 F.3d at 477–78. In sum, we grant immunity when we should deny—and we deny immunity when we should grant.

But be that as it may, I am duty bound to faithfully apply established qualified immunity precedents, just as I am duty bound to faithfully follow *Smith*. I concur in the judgment in part and dissent in part.

## I.

At the time of the Founding, every state except Connecticut provided constitutional protection for religious freedom. But the degree of protection seemed to vary. Eight states—Delaware, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, and South Carolina—protected the right to "worship," often accompanied by language specifically protecting worship according to the dictates of one's "conscience." By contrast, the constitutions of Georgia, Maryland, Rhode Island, and Virginia provided more robust coverage by protecting the "free exercise" of religion—the

language later adopted in the First Amendment. *See* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 HARV. L. REV. 1416, 1455–60 (1990).

As Judge McConnell articulated in his influential work on the subject, understanding the distinction between "worship" and "conscience," as opposed to "free exercise," is critical. "The word 'worship' usually signifies the rituals or ceremonial acts of religion, such as the administration of sacraments or the singing of hymns, and thus would indicate a more restrictive scope for the free exercise provisions." *Id.* at 1460 (citing 4 SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE 888 (Philadelphia 1805)). And "conscience" referred to private thoughts, opinions, and beliefs. 1 JOHNSON, *supra*, at 372–73. For example, Johnson treated "conscience" as synonymous with "knowledge," "[r]eal sentiment; veracity; private thoughts," "[s]cruple; difficulty," and "reason; reasonableness." McConnell, *supra*, at 1489.

By contrast, the word "exercise" strongly connoted action. *See* 2 JOHNSON, *supra*, at 250. Johnson defined "exercise" as "[p]ractice; outward performance," "[u]se; actual application of any thing," "[t]ask; that which one is appointed to perform," or an "[a]ct of divine worship, whether publick or private." *Id.* Similarly, "Noah Webster's American dictionary defined 'exercise' as 'employment.'" McConnell, *supra*, at 1489. And "James Buchanan's 1757 dictionary defined 'exercise' as '[t]o use or practice.'" *Id.*

The broader scope of "exercise"—in contrast to "worship" and "conscience"—indicates that, at the time of the Founding, the public would have understood the right to "free exercise" to extend beyond mere ritual and private belief to cover any action motivated by faith. Consistent with that conclusion, Congress amended the draft language that later became the First Amendment, replacing the original phrase "rights of conscience" with the "free exercise of religion." 1 ANNALS OF CONG. 729–32, 766 (1789). "[I]t would be

difficult on this evidence to conclude that the framers of the free exercise clause intended it to be confined to acts of 'worship.'" McConnell, *supra*, at 1461.

The Founders understood that the right to free exercise would require more than simply neutrality toward religion. Rather, when government regulation and religious activity conflict, the right to free exercise would require that the government accommodate the religious practice, rather than the reverse. As James Madison later wrote, the right to religious exercise should prevail over government regulation "in every case where it does not trespass on private rights or the public peace." *Letter from James Madison to Edward Livingston* (July 10, 1822), in 9 THE WRITINGS OF JAMES MADISON 98, 100 (G. Hunt ed. 1901). After all, "[a] person who is barred from engaging in religiously motivated conduct is barred from freely exercising his religion." *Smith*, 494 U.S. at 893 (O'Connor, J., concurring in the judgment). "[T]hat person is barred from freely exercising his religion regardless of whether the law prohibits the conduct only when engaged in for religious reasons, only by members of that religion, or by all persons." *Id.*

As Justice O'Connor observed, limiting the Free Exercise Clause to a neutrality principle akin to equal protection would impoverish religious liberty. "If the First Amendment is to have any vitality, it ought not be construed to cover only the extreme and hypothetical situation in which a State directly targets a religious practice." *Id.* at 894. That would "relegate[] a serious First Amendment value to the barest level of minimum scrutiny that the Equal Protection Clause already provides." *Id.* (quotations omitted).

It would be of little solace to the person of faith that a non-believer might be equally inconvenienced. For it is the person of faith whose faith is uniquely burdened—the non-believer, by definition, suffers no such crisis of conscience. This recalls Anatole France's mordant remark about "the majestic quality of the law which prohibits the wealthy as well as the poor from sleeping under

the bridges, from begging in the streets, and from stealing bread." ANATOLE FRANCE, THE RED LILY 87 (1910).

Not surprisingly, then, "around the time of the drafting of the Bill of Rights, it was generally accepted that the right to 'free exercise' required, where possible, accommodation of religious practice." *City of Boerne v. Flores*, 521 U.S. 507, 544 (1997) (O'Connor, J., dissenting). States provided religious exemptions in various areas during the Founding Era. Both Quakers and Jews conscientiously refused to take oaths when called to testify in court—Quakers because they believed that the Bible forbade the taking of oaths, and Jews because they did not want to take oaths premised "on the faith of a Christian." So the colonies excused them from that obligation and allowed them to testify by affirmation instead of by oath. McConnell, *supra*, at 1467. Quakers were similarly excused from mandatory military service due to their religious objections to bearing arms. *Id.* at 1468.

Consistent with the Founders' understanding of free exercise, the Supreme Court held in a series of cases that government may not regulate in a manner that burdens religious activity, unless the regulation is narrowly tailored to further a compelling governmental interest.

For example, in *Sherbert v. Verner*, 374 U.S. 398 (1963), South Carolina denied a Seventh-day Adventist unemployment compensation because of her refusal to work on Saturdays—her Sabbath. *Id.* at 399–401. The Court found that the denial clearly "imposes [a] burden on the free exercise of appellant's religion." *Id.* at 403. It held that a "colorable state interest" was insufficient to justify the burden and granted relief on the ground that the State failed to provide a compelling interest. *Id.* at 406–09.

In *Wisconsin v. Yoder*, 406 U.S. 205 (1972), Amish parents challenged a state law requiring children to attend school until the age of sixteen. *Id.* at 207. The parents had a firm and sincere religious objection to higher

education.  *Id.* at 209.  Wisconsin responded that its "interest in universal compulsory formal secondary education to age 16 is so great that it is paramount to the [parents'] undisputed claims."  *Id.* at 219.

Notably, the Court acknowledged "the general applicability of the State's compulsory school-attendance statutes."  *Id.* at 236.  It nevertheless required the state to grant a religious exemption in the absence of a compelling governmental interest.  *See, e.g., id.* at 220 ("[T]here are areas of conduct protected by the Free Exercise Clause of the First Amendment and thus beyond the power of the State to control, even under regulations of general applicability.").

But the Court dramatically altered its course in *Smith*—announcing an exception to *Sherbert* and *Yoder* that the parties had not even requested, let alone briefed.  *See* Michael W. McConnell, *Free Exercise Revisionism and the* Smith *Decision*, 57 U. CHI. L. REV. 1109, 1113 (1990).  *Smith* establishes a substantial exception to the strict *Sherbert* and *Yoder* standard.  After *Smith*, the government may burden religious exercise so long as the burden arises from a "neutral law of general applicability."  494 U.S. at 879.  Under those circumstances, the government would no longer need to show that the regulation is narrowly tailored to further a compelling governmental interest. *Id.* at 882.  *See also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (same).

The reaction to *Smith* was unusually negative.  The other two branches of government united in criticizing *Smith* as inconsistent with a proper understanding of the First Amendment.  In 1993, Congress overwhelmingly passed the Religious Freedom Restoration Act by a 97-3 vote in the Senate and a voice vote in the House of Representatives.  The Act contained legislative findings expressly disavowing *Smith*, stating that "governments should not substantially burden religious exercise without compelling justification," and

that "in *Employment Division v. Smith*, 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion." 42 U.S.C. § 2000bb(a)(3)–(4). The Act vowed to "restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b)(1).

President Clinton agreed. In signing RFRA, he explained that "this act reverses the Supreme Court's decision [in *Smith*] and reestablishes a standard that better protects all Americans of all faiths in the exercise of their religion in a way that I am convinced is far more consistent with the intent of the Founders of this Nation than the Supreme Court decision." *Remarks on Signing the Religious Freedom Restoration Act of 1993*, 2 PUB. PAPERS OF THE PRESIDENT 2000 (1993). "One of the reasons [our Founders] worked so hard to get the first amendment into the Bill of Rights . . . [t]hey knew that religion helps to give our people the character without which a democracy cannot survive." *Id.*

RFRA does not govern this case, however. The Supreme Court has held that Congress did not have the power under Section 5 of the Fourteenth Amendment to apply RFRA to the states. *See Flores*, 521 U.S. at 535. In response to *Flores*, the State of Texas enacted a state law version of RFRA. TEX. CIV. PRAC. & REM. CODE ANN. § 110.001 *et seq.* But Horvath presents no such claim here.

The district court thus held that Horvath's claim is foreclosed by *Smith*. To quote: "The requirement is not aimed at a specific religious practice; it is an attempt to address concerns raised by transmitting infectious diseases by health care workers. *Cf. Smith*, 494 U.S. at 894." *Horvath v. City of Leander*,

1:17-cv-256-RP, at *14 (W.D. Tex. Oct. 10, 2018).  The court thus concluded that the city's policy is "neutral and generally applicable" under *Smith*.  *Id.*

I disagree with the district court's reliance on *Smith*—and applaud the majority for declining to affirm based on *Smith*.  For it is far from clear that the city's vaccination policy is a "neutral law of general applicability."  494 U.S. at 879.  And if it is not, then the policy is subject to the strict standard employed in *Sherbert* and *Yoder*.  For even after *Smith*, "[a] law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny."  *Lukumi*, 508 U.S. at 546.  I would therefore remand for further proceedings to determine whether the city policy is a neutral law of general applicability—and if not, whether the policy satisfies strict scrutiny— because the record appears to be disputed on both questions.

To begin with, the record is unclear whether the city's TDAP vaccine policy provides exemptions for some, while denying exemptions for people of faith like Horvath.  The district court opinion indicates that the city does offer such exemptions, citing the fire chief's own testimony.  *Horvath*, 1:17-cv-256- RP, at *2, *10.  Counsel seemed less certain of this fact, however, when asked at oral argument.  If the city does permit exemptions to the vaccine policy, then the policy is not neutral or generally applicable.  *See Lukumi*, 508 U.S. at 546. Remand would allow the parties to clarify the record on this point.

In addition, the record confirms that the city is apparently willing to grant exemptions in arguably analogous situations, such as under its flu vaccine policy.  Yet for no reason—or at least none that is apparent from the record—the city denied that same request for a religious exemption on behalf of the same firefighter when it came to the TDAP vaccine.  Remand would give the city the opportunity to demonstrate either that the flu vaccine is somehow not analogous to the TDAP vaccine (and that the vaccine policy is therefore

18

neutral and generally applicable)—or that it has a compelling interest in insisting that Horvath take the TDAP vaccine, but not the flu vaccine.

The majority offers an alternative basis for affirming the district court. Instead of relying on *Smith* as the district court did, the majority holds that the city's policy does not substantially burden religion, because the city offered Horvath the option of wearing a respirator instead of taking the vaccine.

But Horvath responds that the city's offer forces him to choose between sacrificing his faith or working under unequal conditions. Other firefighters are not required to wear respirators. And Horvath offered expert testimony that a respirator would impair his ability to do his job well.

The right to free exercise means that government cannot force citizens to choose between one's faith and one's livelihood, absent a compelling reason. In *Sherbert*, the state tried to "force [Adell Sherbert] to choose between following the precepts of her religion and forfeiting benefits . . . and abandoning one of the precepts of her religion in order to accept work." 374 U.S. at 404. The Supreme Court unequivocally rejected that proposition. "Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship." *Id.* "[T]o condition the availability of benefits upon this appellant's willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties." *Id.* at 406.

The Court has applied the same principle in the RFRA context, holding that government substantially burdens religious liberty when it "put[s] family-run businesses to the choice of violating their sincerely held religious beliefs or making all of their employees lose their existing healthcare plans." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 723 (2014). After all, "it is predictable that the companies would face a competitive disadvantage in retaining and

No. 18-51011

attracting skilled workers," if forced to drop insurance coverage to vindicate their faith. *Id.* at 722.

Whether the respirator requirement similarly forces Horvath to make an untenable choice is, at best, a fact dispute that the parties can likewise address on remand. *See, e.g., Horvath*, 1:17-cv-256-RP, at *14 (observing that it is "not clear" whether the respirator requirement burdens Horvath's religion).

I take no position on any of these record issues. They turn on fact disputes that the district court must determine in the first instance. I would simply hold that the Free Exercise Clause entitles Horvath to litigate those issues, even under *Smith*.

## II.

Although I would remand Horvath's Free Exercise claim against the city, I agree that we must affirm his Free Exercise claim against the fire chief, under the doctrine of qualified immunity.

## A.

Qualified immunity forecloses most suits for money damages from government officials. To overcome qualified immunity, Horvath must satisfy two prongs. The first prong should be uncontroversial on its face—Horvath cannot recover unless he first establishes a violation of his legal rights. But that is not enough to overcome qualified immunity. Horvath must also satisfy a second prong—the right must not only be established, but "'*clearly* established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (emphasis added).

The "clearly established" requirement is controversial because it lacks any basis in the text or original understanding of § 1983. Nothing in the text of § 1983—either as originally enacted in 1871 or as it is codified today—supports the imposition of a "clearly established" requirement. *See* An Act to Enforce the Provisions of the Fourteenth Amendment to the Constitution of

the United States, and for Other Purposes, ch. 22, § 1, 17 Stat. 13 (1871); 42 U.S.C. § 1983. *See also* William Baude, *Is Qualified Immunity Unlawful?*, 106 CALIF. L. REV. 45, 50 (2018) ("Neither version of the text, you will notice if you wade through them, makes any reference to immunity.").

By contrast, Congress has expressly adopted a "clearly established" requirement in other contexts. For example, in the Antiterrorism and Effective Death Penalty Act of 1996, Congress imposed special burdens on habeas petitioners who seek relief from convictions. AEDPA requires habeas petitioners not only to establish a violation of law, but to identify "*clearly established Federal law, as determined by the Supreme Court of the United States.*" 28 U.S.C. § 2254(d) (emphasis added). The qualified immunity doctrine imposes a similar "clearly established" standard in § 1983 cases—but without any corresponding textual basis. That is troubling because, in other contexts, the Supreme Court has declined to read language into a statute if Congress explicitly included the same language in other statutes.[3]

Nor is there any other basis for imputing such a requirement to Congress, such as from the common law of 1871 or even from the early practice of § 1983 litigation. *See, e.g., Crawford-El v. Britton*, 523 U.S. 574, 611 (1998) (Scalia, J., dissenting) ("[O]ur treatment of qualified immunity under 42 U.S.C. § 1983 has not purported to be faithful to the common-law immunities that existed when § 1983 was enacted."); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1871

---

[3] *See, e.g., Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176–77 (1994) ("Congress knew how to impose aiding and abetting liability when it chose to do so. . . . If, as respondents seem to say, Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text. But it did not."); *Pinter v. Dahl*, 486 U.S. 622, 650 (1988) ("When Congress wished to create such liability, it had little trouble doing so."); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 572 (1979) ("Obviously, then, when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly."); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 734 (1975) ("When Congress wished to provide a remedy . . . , it had little trouble in doing so expressly.").

(2017) (Thomas, J., concurring in part and concurring in judgment) ("We have not attempted to locate [the "clearly established"] standard in the common law as it existed in 1871 . . . and some evidence supports the conclusion that common-law immunity as it existed in 1871 looked quite different from our current doctrine.") (citing Baude, *supra*, at 52–62).

In sum, there is no textualist or originalist basis to support a "clearly established" requirement in § 1983 cases.

## B.

One of the primary justifications for the "clearly established" requirement is that the fear of litigation not only deters bad conduct, but chills good conduct as well. That is a valid but, I believe, ultimately misplaced concern. For if courts simply applied the *first* prong of the doctrine in a manner more consistent with the text and original understanding of the Constitution, we might find that the second prong is unnecessary to prevent chilling, as well as unwarranted by the text.

Law enforcement officials and other public officials who engage in misconduct should be held accountable. "Nothing is more corrosive to public confidence in our criminal justice system than the perception that there are two different legal standards." *United States v. Taffaro*, 919 F.3d 947, 949 (5th Cir. 2019) (Ho, J., concurring in the judgment). Public officials who violate the law without consequence "only further fuel public cynicism and distrust of our institutions of government." *Id.*

But there is also concern that the fear of litigation chills public officials from lawfully carrying out their duties. After all, "it cannot be disputed seriously that claims frequently run against the innocent as well as the guilty—at a cost not only to the defendant officials, but to society as a whole." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). "[T]here is the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the most

irresponsible [public officials], in the unflinching discharge of their duties.'" *Id.* (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (Hand, C.J.)). *See also*, *e.g.*, *Wilkie v. Robbins*, 551 U.S. 537, 562 (2007) (same). "The specter of personal liability for a mistake in judgment may cause a prudent police officer to close his eyes." *Malley v. Briggs*, 475 U.S. 335, 353 (1986) (Powell, J., concurring in part and dissenting in part). "Law enforcement is ill-served by this *in terrorem* restraint." *Id.* at 354.[4]

Much of the chilling problem, however, stems from misuse of the first prong of the doctrine. Simply put, courts find constitutional violations where they do not exist.

For example, the Fourth Amendment does not prohibit reasonable efforts to protect law-abiding citizens from violent criminals—it forbids only "*unreasonable* searches and seizures." U.S. CONST. amend. IV (emphasis added). As those words were understood at the time of the Founding, the Fourth Amendment allows police officers to take the steps necessary to apprehend and prevent felons from harming innocent citizens.

Courts often look "to the common law in evaluating the reasonableness, for Fourth Amendment purposes, of police activity." *Tennessee v. Garner*, 471 U.S. 1, 13 (1985). The common law "allowed the use of whatever force was necessary to effect the arrest of a fleeing felon." *Id.* at 12. *See also, e.g.*, 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *292 (same). And although the Court has not embraced the full force of the common law, it has recognized the constitutionality of deadly force where an officer has

---

[4] *Compare Zadeh v. Robinson*, 928 F.3d 457, 479 (5th Cir. 2019) (Willett, J., concurring in part, dissenting in part) ("To some observers, qualified immunity smacks of unqualified impunity, letting public officials duck consequences for bad behavior"), *with Rudolph v. Babinec*, 939 F.3d 742, 756 (6th Cir. 2019) (Thapar, J., concurring in part and dissenting in part) ("Qualified immunity exists to insulate these difficult judgment calls. We would all be ill-served if it did not.").

"probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner*, 471 U.S. at 3.

So if chilling police conduct is the concern, there is no need for an atextual "clearly established" requirement. The Constitution should be enough—if we get the substantive Fourth Amendment analysis right.

Our court's recent debates about qualified immunity illustrate this point. In *Winzer v. Kaufman County*, 916 F.3d 464 (5th Cir. 2019), no member of our court claimed that the officers violated "clearly established" law. We all agreed that the officers involved in the death of a suspected active shooter were entitled to qualified immunity under the second prong. *See id.* at 482 (Clement, J., dissenting in part) ("Fortunately, the majority at least gets the second prong of the qualified immunity analysis right."). What divided us was the first prong—whether the plaintiff established a violation of the Fourth Amendment. Four members of our court dissented from the denial of rehearing en banc, writing that, "[i]f we want to stop mass shootings, we should stop punishing police officers who put their lives on the line to prevent them"— echoing the same chilling concerns previously expressed by the Supreme Court. *Winzer v. Kaufman County*, 940 F.3d 900, 901 (5th Cir. 2019) (Ho, J., dissenting from denial of rehearing en banc). But we did so under the first prong, not the second. *See id.* ("The Fourth Amendment prohibits 'unreasonable searches and seizures'—not reasonable efforts to protect citizens from active shooters.").

So too in *Cole v. Carson*, 935 F.3d 444 (5th Cir. 2019) (en banc). There we again divided over whether the officers violated the Fourth Amendment— the first prong of the qualified immunity doctrine—in taking steps to prevent a distraught and armed teenager from shooting up a nearby school. *See, e.g.*, *id.* at 478 (Ho & Oldham, JJ., dissenting) ("Does the majority seriously believe that it is an 'unreasonable seizure,' *as those words were originally understood*

*at the Founding*, for a police officer to stop an armed and mentally unstable teenager from shooting innocent officers, students, and teachers?").    Once again, so long as the substantive analysis under the first prong is right, there is no need for the second prong.

There is an additional reason why the fear of chilling public officials does not justify a "clearly established" requirement unsupported by text.    When it comes to the First Amendment, for example, we are concerned about government chilling the citizen—not the other way around.[5]

Consider *Sause v. Bauer*, 138 S. Ct. 2561 (2018) (per curiam).    Two police officers, acting on a noise complaint, entered the home of Mary Anne Sause. Fearful of the police presence, she asked if she could pray.    According to her complaint, the officers responded abusively and ordered her not to pray.    *Id.* at 2562.    The Free Exercise Clause plainly protects the right to pray in one's own home.    *Id.*    Yet two federal courts held that it was not "clearly established" at the time of the violation and granted qualified immunity.    *Id.*    It took summary reversal by the Supreme Court to get Mary Anne Sause her day in court.

Our court addressed a similar situation in *Morgan v. Swanson*, 659 F.3d 359 (5th Cir. 2011) (en banc).    Two children wanted to hand out religiously-themed candy-canes and pencils to their classmates during Christmas.    But the school principals stopped them.    A majority of the court held that this conduct violated the First Amendment.    *Id.* at 412 (Elrod, J., writing for the majority in part).    But a different majority of the court held that the conduct did not violate "*clearly* established" law.    *Id.* at 389 (Benavides, J.).

---

[5] *See, e.g.*, *Multimedia Holdings Corp. v. Cir. Ct. of Fla.*, 544 U.S. 1301, 1304 (2005) ("[S]pecial First Amendment concerns" are raised when a regulation "may chill protected speech."); *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965) ("The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure.").

## C.

A similar justification for the "clearly established" requirement might be described as "two wrongs make a right." Baude, *supra*, at 63. As the theory goes, courts too often impose liability on public officials under the first prong—so the second prong is needed to limit judicial adventurism. *See id.* ("Two wrongs, Justice Scalia might have said, can make a right.").

But that is a false choice—not to mention a troubling one. To avoid *Winzer* and *Cole*, Sause and Morgan should not have to suffer. We can walk and chew gum at the same time. Courts can faithfully interpret the Fourth Amendment as well as § 1983. We can get *both* prongs of the doctrine right. *Cf. Cole*, 935 F.3d at 477 (Ho & Oldham, JJ., dissenting) ("A principled originalist would fairly review decisions that favor plaintiffs as well as police officers.").[6]

* * *

*Smith* does not foreclose Horvath's Free Exercise claim against the city. But qualified immunity requires us to affirm the judgment as to the fire chief. I would vacate the judgment as to the Free Exercise claim against the city and remand to allow Horvath to proceed on that claim. I dissent in part for that reason. In all other respects, I concur in the judgment.

---

[6] As Justice Scalia, joined by Justice Thomas, fairly observed in *Crawford-El*, 523 U.S. at 611–12 (Scalia, J., dissenting), we must also get *Monroe v. Pape*, 365 U.S. 167 (1961), right. But that turns out to be a closer call. Justices Scalia and Thomas question *Monroe*. But Professor Baude offers a robust response. *Compare Crawford-El*, 523 U.S. at 611, *with* Baude, *supra*, at 63–66. Professor Baude also suggests that, even if *Monroe* was incorrectly decided, a proportionate response would look very different from the judicially invented "clearly established" requirement. Baude, *supra*, at 66–69; *see, e.g., id.* at 69 (suggesting a requirement of exhaustion of state law remedies instead).